# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES,

    Plaintiff,

v.

ALAN EUGENE DAWSON,

    Defendant,

Case No. 18-40085-HLT

## MEMORANDUM AND ORDER

A grand jury returned a four-count indictment against Defendant Alan Eugene Dawson, charging him with drug and related firearm crimes. The court released Mr. Dawson on bond pending trial after the government informed the court that it was not seeking pretrial detention. During Mr. Dawson's pretrial release, he was largely compliant, with only relatively minor violations. On May 14, 2020, Mr. Dawson appeared in court and, pursuant to a plea agreement, pleaded guilty to conspiracy to possess with the intent to distribute 50 or more grams of methamphetamine (Count 1). The remaining counts are subject to dismissal at sentencing. Because Mr. Dawson pleaded guilty to a crime requiring mandatory detention, the district judge ordered him detained pending sentencing. He now moves for immediate release under 18 U.S.C. § 3142(i) and 18 U.S.C. § 3145(c) because he contends that his underlying health conditions put him at an increased risk of suffering severe complications if he were to develop coronavirus disease ("COVID-19") caused by the virus SARS-CoV-2.

Although Mr. Dawson's motion invokes § 3142(i), it does not apply here because it applies to individuals seeking release pending trial, not those seeking release pending sentencing, as is the case here. *See United States v. Duncan*, 18-40030-01-HLT, 2020 WL 1700355, at *5 (D. Kan.

Apr. 8, 2020). Rather, 18 U.S.C. § 3145(c) governs. That statute allows for release—if a defendant *first* shows by clear and convincing evidence that he is not a flight risk and does not pose a danger to the community—for "exceptional reasons." Mr. Dawson's motion meets those criteria. Mr. Dawson is a release-able defendant, as evidenced by the court's initial determination to release him pending trial, and further bolstered by his demonstrated ability to largely comply with those conditions while on release. Mr. Dawson has also shown that he has an underlying health condition that the Centers for Disease Control and Prevention ("CDC") recognizes puts him at an increased risk of suffering severe illness if he were to contract COVID-19.

There are no easy answers to criminal defendants' motions for release based on the COVID-19 global pandemic. Those living in close quarters, including inmates, face increased risks of contamination, but that alone cannot be the basis to release inmates *en masse*. Many of these individuals are likely to continue to commit crimes requiring the attention of law enforcement officers at a time when those agencies are strapped thin. So releasing defendants who pose a danger to others or who are a flight risk trades one set of problems for another: the defendant may have a potentially lessened risk of infection in certain communities, but those communities would bear the burden of likely increased rates of criminal activity that would siphon public resources at a time when they are desperately needed. Mr. Dawson presents the exception in that he does not pose these risks and he has a medical condition that puts him at risk for severe illness from COVID-19. For these reasons, and the others explained below, the court grants his motion.

I. **BACKGROUND**

On September 19, 2018, the grand jury returned a four-count indictment against Mr. Dawson, charging him with conspiracy to possess with the intent to distribute 50 grams or more of methamphetamine (Count 1); possession with the intent to distribute 50 grams or more of

methamphetamine (Count 2); possession of firearms in furtherance of a drug-trafficking crime (Count 3); and possession of a firearm by an unlawful user of a controlled substance (Count 4). At Mr. Dawson's initial appearance, the government initially requested that the court detain him pending trial. But by the detention hearing on September 27, 2018, the government determined that it would not seek detention based on the pretrial service officer's opinion that Mr. Dawson had proposed a workable release plan. (ECF No. 12.) The court found that it could fashion conditions of release that could reasonably assure that Mr. Dawson would appear as required in this case and also assure the safety of the community. Pretrial services' records reveal mostly early and relatively minor violations while Mr. Dawson was on pretrial release, including methamphetamine use on November 29, 2018, and failure to attend treatment on November 29 and December 14, 2018, and March 11, 2019. Pretrial services notified the court, but no formal action was taken to revoke Mr. Dawson's pretrial release.

Mr. Dawson remained on pretrial release until May 14, 2019, when he pleaded guilty to conspiracy to possess with the intent to distribute 50 or more grams of methamphetamine (Count 1). The guilty plea subjects Mr. Dawson to mandatory detention pending sentencing, which is currently scheduled for May 5, 2020. Mr. Dawson is housed at the Leavenworth Detention Center ("LDC") in Leavenworth, Kansas, operated by CoreCivic, but he now seeks release from custody because he contends that his conditions of confinement put him at an increased risk for contracting COVID-19, and his underlying health conditions put him at an increase risk of suffering severe complications if he contracts the virus.

Mr. Dawson proposes that the court release him to remain on home detention or home incarceration with or without GPS monitoring. He proposes he be released to live with his mother in Topeka, Kansas, and he states that he would self-quarantine for two weeks to ensure that he

does not endanger anyone else in the community in case he has already contracted COIVD-19 while at the LDC.

## II. RELEASE FOR "EXCEPTIONAL REASONS" UNDER § 3145(c)

In 1990, Congress enacted the Mandatory Detention for Offenders Convicted of Serious Crimes Act ("the Mandatory Detention Act") as an amendment to the Bail Reform Act to require detention of defendants found guilty (or pleading guilty) to offenses described in 18 U.S.C. § 3142(f)(1)(A)-(C) pending their sentencing hearings. 18 U.S.C. § 3143(a)(2). The crime to which Mr. Dawson has pleaded guilty subjects him to mandatory detention under the Act.

Mr. Dawson now moves for release prior to sentencing pursuant to 18 U.S.C. § 3145(c). That statute provides in pertinent part as follows:

> A person subject to detention pursuant to section 3143(a)(2) . . . and who meets the conditions of release set forth in section 3143(a)(1) [governing release or detention pending sentencing] or (b)(1) [governing release or detention pending appeal], may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c). For Mr. Dawson to obtain release under this section, he must meet both of the conditions set forth in § 3143(a)(1), *and* he must make "a clear showing of exceptional reasons why his detention would not be appropriate." *United States v. Kinslow*, 105 F.3d 555, 557 (10th Cir. 1997). Under § 3143(a)(1), he must show "by clear and convincing evidence, that he [is] not [1] 'likely to flee or [2] pose a danger to the safety of any other person or the community if released.'" *Id.* (quoting 18 U.S.C. § 3143(a)(1)).

### A. Risk of Flight and Risk of Harm to Others

Mr. Dawson has shown by clear and convincing evidence that he is not likely to flee if released from custody. Specifically, he notes that he remained on pretrial release from September

4

27, 2018, to May 14, 2019, when he pleaded guilty. (ECF No. 43, at 11.) During that time, he attended his court appearances, maintained the same address, and remained in contact with his supervising pretrial services officer. (*Id.*) He obtained employment and maintained his job until he went into custody. (*Id.*) He is also a long-time Topeka resident with strong ties to the community.

Mr. Dawson has also shown by clear and convincing evidence that he would not pose a danger to the safety of any other person or the community. As Mr. Dawson notes, he does not have a significant criminal history and has no history of crimes of violence. (ECF No. 43, at 12.) The Presentence Investigation Report reflects a 2011 conviction and fine for lack of liability insurance in violation of Topeka Municipal code—but nothing else. Mr. Dawson also states that the weapons found in his home upon his arrest were seized by law enforcement and that there are no guns or weapons at his mother's home, where he plans to reside. (*Id.*)

The government does not contest or even directly address Mr. Dawson's showing or whether it meets the first prong of release under § 3145(c). The most the government says is included in its "Procedural History" section in which the government notes that Mr. Dawson has violation memos on file for a positive drug test and failure to attend treatment. But the government goes on to concede that, "Mr. Dawson did manage to get his substance abuse issue under control after some treatment and did manage to obtain employment after three months of being on supervision and maintained the employment until he was taken into custody at his change of plea." (ECF No. 43, at 3-4.)

The court agrees that the record largely demonstrates that Mr. Dawson was compliant with his release conditions. The violations Mr. Dawson committed largely resulted in harm to himself, not to others, and they did not result in a petition to revoke his pretrial release. Moreover, the

government already considered Mr. Dawson's potential risk of flight and risk of harm when it initially determined not to seek detention, as did the magistrate judge when he ordered defendant released on conditions. While the undersigned is not bound by these determinations on a § 3145(c) motion, the fact that Mr. Dawson largely successfully remained on pretrial release only bolsters the magistrate judge's initial determination and also leads the court to conclude that Mr. Dawson would continue to comply with conditions. The court finds that Mr. Dawson has met his burden to show by clear and convincing evidence that he is not likely to flee and would not pose a danger to others.

### B. Exceptional Reasons

Section 3145(c) does not define the phrase "exceptional reasons," but the Tenth Circuit has directed that they must be circumstances that extend beyond the ordinary. *United States v. Velarde*, 555 F. App'x 840, 841 (10th Cir. 2014). Courts addressing the "exceptional reasons" provision have expressed varying views and left the phrase open-ended. *See United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991) (similarly limiting the phrase to situations that "present a unique combination of circumstances giving rise to situations that are out of the ordinary"). The Ninth Circuit has observed that "[t]he district court might also consider circumstances that would render the hardships of prison unusually harsh for a particular defendant," such as a serious illness or injury. *See United States v. Garcia*, 340 F.3d 1013, 1019–20 (9th Cir. 2003) (setting forth several circumstances that the district court could consider in determining whether they rise of the level of exceptional reasons justifying release). However, the Tenth Circuit has cautioned that "it is a rare case in which health conditions present an exceptional reason." *See United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (internal quotations omitted). But of course, the Tenth Circuit did not make this statement in the context of a global pandemic.

What is clear is that the exceptional-reasons clause calls for a case-by-case analysis of each defendant's situation, even amid the significant risks COVID-19 poses to all of us. *See, e.g., United States v. Williams*, No. 19-10165-01-JWB, 2020 WL 1687506, at *2 (D. Kan. Apr. 7, 2020) (recognizing that exceptional reasons might be shown by a defendant at risk of significant illness or potential death in the event of contracting COVID-19 but finding the defendant had not established he was at an increased risk of severe illness); *United States v. Neadeau*, No. CR1900145DWFLIB, 2020 WL 1694853, at *4 (D. Minn. Apr. 7, 2020) ("While the Court recognizes the gravity of COVID-19 pandemic and the special threat it poses to those in communal settings, the Court finds that the circumstances presented here do not warrant release."); *United States v. Graham*, No. 19CR1852SRNKMM, 2020 WL 1685912, at *5 (D. Minn. Apr. 7, 2020) (finding that while COVID-19 posed very real risks, defendant's concern was too generalized and speculative to constitute an exceptional reason warranting release); *United States v. Jones*, No. CR 18-100, 2020 WL 1674145, at *4 (W.D. Pa. Apr. 6, 2020) (speculation concerning present or future conditions involving COVID-19 did not establish exceptional reasons); *United States v. Lopez*, No. 19CR116KMWJLC, 2020 WL 1678806, at *2 (S.D.N.Y. Apr. 6, 2020) (finding that a defendant's medical conditions, including severe asthma, put him at an increased risk for severe illness from COIVD-19 and therefore constituted exceptional reasons for release). If a risk posed by COVID-19 is so general that it is a risk felt by the society at large or even the prison population as a whole, it does not rise to the level of circumstances extending beyond the ordinary because the current "ordinary" is chilling, with forecasts of an unprecedented nationwide death toll.[1]

---

[1] Models predicting expected spread of the virus in the U.S. paint a grim picture, THE NEW YORK TIMES, https://www.nytimes.com/2020/03/31/world/coronavirus-live-news-updates.html#link-a737c70 (last visited Apr. 8, 2020) (predicting a death toll between 100,000 and 240,000 Americans).

In the context of a § 3145(c) motion, the court is mindful that movants are individuals who have been convicted of or pleaded guilty to criminal charges and are awaiting sentencing. When the court sentences a defendant to prison, the court commits the defendant to the custody of the U.S. Bureau of Prisons ("BOP"). The court therefore finds it helpful to look to the guidance that U.S. Attorney General William Barr issued to the BOP director in light of the COVID-19 pandemic to ensure that the BOP utilizes home confinement in appropriate situations to protect the health and safety of inmates and personnel while still ensuring public safety.[2] Although that guidance is certainly not binding on this court, it provides a helpful framework that takes into consideration the various interests at stake during this unique pandemic. The Attorney General has directed the BOP to grant eligible prisoners home confinement in certain circumstances considering certain non-exhaustive factors including:

> (1) The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;
>
> (2) The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
>
> (3) The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
>
> (4) The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

---

[2] Memorandum for Director of Bureau of Prisons, OFFICE OF THE ATTORNEY GENERAL, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=9&ved=2ahUKEwj83p WgvNnoAhV2hHIEHUk3AMoQFjAIegQIChAB&url=https%3A%2F%2Fwww.justice.gov%2F file%2F1262731%2Fdownload&usg=AOvVaw2LCR9OrW0v1e1ngJpgeMYf (last visited Apr. 8, 2020).

> (5) Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;
>
> (6) The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.[3]

In addition to considering those factors, the Attorney General also directed that the BOP should consider an inmate's risk factors for severe COVID-19 illness, risks of illness at the facility, and risks of illness at the location where the inmate seeks to reside, being mindful that the BOP should not release inmates to home confinement when doing so would increase an inmate's risk of contracting COVID-19.

In *United States v. Clark*, the undersigned considered a motion for modification of a pretrial detention order under 18 U.S.C. § 3142(i) of the Bail Reform Act for what the defendant argued were "compelling reasons" related to COVID-19. No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kan. Mar. 25, 2020). The court set forth four factors to consider on § 3142(i) motions:

> (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

---

[3] For clarity of this order, the court has numbered the bullet-point list.

*Id.* at \*3. The above factors are also non-exhaustive and are not necessarily weighted equally. *Id.* They overlap significantly with the Attorney General's guidance and first prong of a motion for release under § 3145(c).

Given the procedural posture of Mr. Dawson's case, the court believes that focusing on the Attorney General's guidance ensures a more uniform and just result. In the context of a § 3145(c) motion based on COVID-19, the defendant has already been convicted and is awaiting sentencing. Likewise, inmates in the BOP have already been convicted. The only procedural difference between the two categories is that inmates in the custody of the BOP have already been sentenced whereas those inmates invoking § 3145(c) have not. It would make little sense for defendants awaiting sentencing to be treated more or less favorably than those already sentenced, absent a compelling reason.

To that end, Mr. Dawson's arguments fall into several factors the Attorney General has directed the BOP to consider, and so the undersigned will also consider them here.

### 1. The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines

Mr. Dawson argues that he is at an increased risk of suffering severe illness if he contracts COVID-19 because he is obese and suffers from sleep apnea. He notes that the CDC lists "people with severe obesity (body mass index [BMI] of 40 or higher)" as a category of individuals who might be at a higher risk for severe illness. (ECF No. 43, at 6.)[4] He states that his BMI is 51.5. (*Id.*) The government notes that Mr. Dawson reported to pretrial services that is 6 feet tall and weighs approximately 380 pounds, which only bolsters Mr. Dawson's point. (ECF No. 46, at 10.)

---

[4] (citing CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 8, 2020)).

Plugging those numbers into the CDC's BMI calculator reveals a BMI of 51.1, just as Mr. Dawson states, which puts him in the category of being obese.[5] The government notes that Mr. Dawson presents no plan to address his obesity and that he also failed to address it while he was on pretrial release. (ECF No. 46, at 11.) This argument misses the mark. The point of releasing Mr. Dawson would be so that he could attempt to avoid a poor outcome if he were to contract COVID-19, not to put him on a weight-loss regimen while at his mother's house. His current predicament is far more immediate than long-term weight-loss solutions. The court finds that Mr. Dawson has established that his obesity puts him at an increased risk for severe illness if he were to contract COVID-19, which weighs in favor of finding exceptional reasons.

He also argues that his sleep apnea puts him at an increased risk of suffering severe illness. On this point, he cites a post from a Dr. Carl Rosenberg on the website for Sleep Health Solutions Ohio, not CDC guidance. (ECF No. 7, at 43.)[6] Although it is not entirely clear, Sleep Health Solutions appears to be a for-profit business providing diagnostic treatment and "sleep coaching."[7] The court does not find material posted on Sleep Health Solutions (even if authored by a medical doctor) to be a reliable source in the face of comprehensive CDC guidance and an abundance of other guidance from similarly authoritative sources, such as the World Health Organization. The

---

[5] CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Apr. 8, 2020)).

[6] SLEEP HEALTH SOLUTIONS, https://www.sleephealthsolutionsohio.com/blog/coronavirus-sleep-apnea-cpap-therapy/ (last visited Apr. 8, 2020).

[7] SLEEP HEALTH SOLUTIONS, https://www.sleephealthsolutionsohio.com/services/ (last visited Apr. 8, 2020) ("If you are one of the many who suffer from poor quality sleep, Sleep Health Solutions can provide you with a safe, comfortable and compassionate environment where your sleep disorder can be diagnosed and effective treatment recommended.").

court finds that Mr. Dawson has not established that his sleep apnea puts him at an increased risk for severe illness were he to contract COVID-19.

### 2. The security level of the facility holding the inmate and the inmate's conduct in prison

The Attorney General's guidance directs the BOP to give priority to inmates residing in low-and minimum-security facilities and those with good conduct in prison. Violent inmates, those engaged in gang-related activity, or those who have incurred BOP violations within the past year would not receive priority. Although the BOP has not yet determined where Mr. Dawson will ultimately be housed, the court considers this factor because Mr. Dawson argues that, because of his lack of significant criminal history, age, and behavior while at LDC, he would likely be eligible for a low-security facility, like a BOP camp). (ECF No. 43, at 14.)

The government does not refute this, instead taking the position that "any release would have to come from the BOP." (ECF No. 46, at 13.) Again, the government misses the mark. Mr. Dawson did not argue that the court was bound by the guidance; he argued that the court should consider it, and the government has provided no reason why the court should not. Moreover, many of the factors presented in the Attorney General's letter overlap with this court's decision in *Clark*, cited by the government. The government does not dispute that Mr. Dawson would be eligible for a lower security facility or that he has had good behavior while at LDC. On this record, the court finds Mr. Dawson has shown these factors weigh in favor of finding exceptional reasons for release.

### 3. Mr. Dawson's proposed release plan

The Attorney General's guidance instructs the BOP to consider whether the inmate has a verifiable re-entry plan aimed at preventing recidivism and maximizing public safety. The plan

must also present a lower risk of the inmate contracting COVID-19 than the inmate would face in the facility. In this context, the court considers Mr. Dawson's proposed release plan.

Mr. Dawson's release plan meets the first set of goals for largely the reasons already explained. Mr. Dawson has shown that he can comply with conditions and that he is not a flight risk or a danger to the community.

As to the second set of goals, Mr. Dawson has shown that his proposed release plan would place him at a lesser risk of contracting COVID-19 than if he were to remain in LDC. Increasingly, criminal defendants and the government submit the same types of lengthy briefs on this issue, with the defendants arguing that their conditions of confinement put them at an increased risk of contracting COVID-19 and the government arguing that this is speculative because there are no known cases at the facility. Such broad-brush arguments are typically not helpful to the court because they are not tailored to the particular circumstances and legal standards at issue.

In previous cases, the undersigned has been unable to conclude whether a proposed release plan truly mitigates a defendant's risk of COVID-19 given that there are no known cases of COVID-19 at LDC, coupled with the fact that those proposed release plans carried their own inherent risks—*e.g.*, a proposal to reside in a COVID-19 "hot spot," excessive travel, contact with community members, and residing with an individual in her own high-risk category. *See, e.g., Duncan*, 2020 WL 1700355, at *8 (proposing a plan requiring travel, residing with a person in high-risk category, and requiring contact with others to register as a sex offender); *Clark*, 2020 WL 1446895, at *7 (proposing a plan requiring travel to Chicago). What was also key to those decisions—and what sets Mr. Dawson apart—is that those individuals were likely to violate conditions of release, which poses not just a danger to the community itself but a significantly increased risk of spreading COVID-19 to those charged with coming in contact with the defendants

13

when they violate, including risks to other inmates when the defendants inevitably end up back at LDC. Unlike those cases, Mr. Dawson has proposed a reasonable release plan and had a history of largely complying with conditions. The court therefore finds this factor weighs in his favor when considering exceptional reasons.

### 4. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community

The parties do not make arguments about how the court should consider or weigh Mr. Dawson's guilty plea as to Count 1 of the indictment. While conspiring to possess and distribute methamphetamine is a serious crime that carries with it the possibility of a lengthy prison sentence, it is not a crime of violence. And, as the court has already concluded, Mr. Dawson has shown that he does not pose a danger to the community. Therefore, this factor also weighs in favor of finding exceptional reasons.

## C. Conclusion

Mr. Dawson has shown that he is entitled to release under § 3145(c). He has demonstrated by clear and convincing evidence that he is not a risk of flight or a danger to the community. He has also established that exceptional reasons justify his release. He has a medical condition (obesity) that the CDC recognizes puts him at an increased risk of developing serious illness if he were to become infected with COVID-19. While this is true for many criminal defendants, what sets Mr. Dawson apart is that he is a low-risk, non-violent offender with a history of good behavior while incarcerated and a history of largely complying with conditions of release. He has also proposed a reasonable release plan that is tailored to mitigate his own risk of contracting COVID-19 while not increasing risks to others. In other words, the court can release Mr. Dawson with confidence that the release plan lessens his own risks while not increasing the risks to society at large.

For these reasons, the court grants his motion and reinstates his previous conditions of release (ECF Nos. 11, 22), with the exception that the court removes the condition that Mr. Dawson is required to obtain and maintain employment. The court adds the condition that Mr. Dawson is to remain on home detention, restricted to his residence at all times, except for education; religious services, medical, substance abuse, or mental health treatment, attorney visits, court appearances, court-ordered obligations, or other activities approved in advance by the pretrial services office. While the pretrial services office retains discretion to require Mr. Dawson to participate in substance abuse and/or psychiatric treatment, the undersigned encourages them to consider measures that would also ensure social distancing.

**IT IS THEREFORE ORDERED** that Mr. Dawson's Emergency Motion for Immediate Release (ECF No. 43) is granted.

**IT IS THEREFORE ORDERED** that Mr. Dawson's Motion for an Evidentiary Hearing and to File and Additional Reply Brief (ECF No. 47) is denied as moot.

**IT IS SO ORDERED.**

Dated April 9, 2020, at Topeka, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge